Richard M. Garbarini (RG 5496)
GARBARINI FITZGERALD P.C.
250 Park Avenue 7th Floor
New York, New York 10177
Telephone: (212) 300-5358
Facsimile: (347) 218-9478

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x

RICHARD CUPOLO, and BRIAN EICH,
individually and on behalf of all other similarly
situated copyright holders,

                    Plaintiffs,

                 v.

AMAZON.COM, INC., and AMAZON
DIGITAL SERVICES, INC.,

                    Defendants.

--------------------------------------------------------x

Index No.: 17-cv-2145

**CLASS ACTION COMPLAINT
AND JURY DEMAND FOR
DAMAGES FOR COPYRIGHT
INFRINGEMENT AND
UNDERPAYMENT OF
ROYALTIES**

Plaintiffs RICHARD CUPOLO ("CUPOLO"), and BRIAN EICH ("EICH") by and

through their attorneys at GARBARINI FITZGERALD P.C., bring this Class Action Complaint

and Jury Demand against Defendants AMAZON.COM, INC. ("AMAZON") and AMAZON

DIGITAL SERVICES, INC., ("ADS") based on Defendants' infringement of Plaintiffs' and the

Putative Publishing Class' rights to their copyrighted musical works pursuant to the Copyright

Act and Copyright Revisions Act, 17 U.S.C. §§ 101 *et seq.* (the "Copyright Act" or "Act"), and

Defendants' deliberate scheme to withhold royalties owed Plaintiffs, and a Putative Publishing

Royalty Class of copyright holders that received royalties.

## NATURE OF THE ACTION

1.      Plaintiffs CUPOLO, and EICH own the publishing rights to a combined twelve (12) copyright registrations.  The named Plaintiffs bring this matter on behalf of Plaintiffs and two putative classes.  The first is a Putative Publishing Class comprised of independent artists and seeks to remedy Defendants' systematic infringement of their copyrighted recordings.  The second is a Putative Publishing Royalty Class comprised of all artists on Defendants system seeking to remedy Defendants systematic theft of royalties.

2.      Defendants own and operate numerous music products subject to Section 115 of the Act ("Section 115").  Those products include Defendants' "Music Unlimited", "Cloud Player Premium" a/k/a "Paid Music Locker" and "Purchased-Locker Content", "Prime Music", and "Music Unlimited".  Defendants' Cloud Player (Paid Locker and Unpaid Locker), fell under Section 115 as of January 1, 2014 with the most recent amendment to Section 115.  Defendants' Locker products may have fallen under Section 115 prior to January 1, 2014 with the inclusion of features that allow playlists, song sharing, and the "scan and match" technology.  Defendants' "Prime Music" and "Music Unlimited" products were at all times relevant covered by Section 115.

3.      Professional Rights Organization ("PRO") TuneCore, Inc. submitted CUPOLO's, recordings to Defendants' Music Store (a non-Section 115 product) for review in or about July 2012.  Plaintiff EICH's copyrighted recordings were submitted by PRO CD Baby for review sometime in 2013.  EICH wasn't even aware his recordings were submitted.

4.      Defendants reproduced Plaintiffs entire catalogue in its Music Store and copied Plaintiff's entire catalogue to their Paid Locker and Purchased-Content Locker, Prime Music and Unlimited Music products without notice or permission of Plaintiffs.

5.      Pursuant to Section 115, Defendants were required to serve a Notice of Intent to Obtain a Compulsory License ("NOI"), in the form proscribed by 37 CFR § 201.18, prior to distributing, or within one month of making available, each of Plaintiffs' copyrighted recordings. Defendants failed to serve a valid NOI for any Plaintiff for any recording.  Plaintiffs EICH and CUPOLO never received an NOI.

6.      Defendants jointly engaged in a systematic process of infringement by, inter alia: (i) reproducing Plaintiffs' and the Putative Publishing Class' recordings without a first serving an NOI, (ii) deliberately deleting stream information to hide Defendants' systematic infringement; (iii) failing to serve any Monthly and Annual Statements of Account to conceal the infringements; and (iv) failing to serve renewal NOIs two years after the original.

7.      Defendants deprived Plaintiffs and the Putative Publishing Royalty Class of royalties by: (i) not paying royalties on streamed recordings; (ii) deliberately deleting stream data; (iii) deliberately deleting the run-time data for recordings over five minutes to avoid paying the royalty multiplier; (iv) failing to compensate artists for all streams under $50.00; (v) failing to provide accurate data to artists related to promotional streams, and incomplete streams; and (vii) failing to serve Monthly and Annual Statements of Account to conceal the stolen royalties.

8.      Defendants also artificially deflated their royalty payment obligations to almost nothing by: (i) illegally manipulating the per-stream royalty rate; (ii) miscalculating the all-in payable royalty pool; (iii) falsely claiming they are a bundled service; (iv) obfuscating the nature of its service to qualify for a lower statutory per user rate; (v) deleting the run-times of 25-35% of the recordings on its service by classifying them as "unknown" to avoid paying a royalty multiplier; (vi) physically changing the run-times of some recordings to avoid paying the royalty multiplier; (vii) failing to include revenue in certain calculations, and illegally excluded revenue

in others; and (viii) failing to pay late fees.

9.      The laundry list of frauds, and misdeeds, perpetrated by the Defendants shocks the conscious.  Defendants altered records, misstated information, and systematically infringed the copyrighted recordings of Plaintiffs' and the Putative Publishing Class', while simultaneously engaging in an illegal scheme to reduce its royalty obligations to almost nothing in violation of the Copyright Act.

## PARTIES

10.     At all times material hereto, plaintiff Richard Cupolo ("CUPOLO") was, and is, an individual and resident of Queens.  CUPOLO released ten (10) recordings covered by ten (10) U.S. Copyright Registrations under the name *City Society* to Defendants' Music Store for Defendants' review.  Defendants elected to exploit CUPOLO's copyrighted recordings from January 1, 2014 through March 2014 in their Paid locker and Purchased-content Locker products without: (i) service of an NOI, (ii) service of any Monthly Statements of Account, (iii) service of any Annual Statements of Account, or (iv) payment of any royalties or late fees.

11.     At all times material hereto, plaintiff Brian Eich ("EICH") was, and is, an individual and resident of Mineola, New York.  EICH released two albums covered by two U.S. Copyright Registrations to Defendants' Music Store for review.  Those recordings were released to Defendants' Music Store for review.  Defendants elected to exploit the copyrighted recordings on their Section 115 covered products from January 1, 2014 through the date of this Complaint in Defendants' Paid and Purchased-Content Lockers, and from June 2014 in their Prime Music, and Unlimited Music products without: (i) service of an NOI, (ii) service of any Monthly Statements of Account, (iii) service of any Annual Statements of Account, or (iv) payment of any royalties or late fees.

12.     CUPOLO, and EICH are collectively referred to here as "Plaintiffs".

13.     Upon information and belief, defendant AMAZON.COM, INC. ("AMAZON") is a Delaware corporation with its principal place of business in Seattle, Washington. AMAZON owns and operates the Amazon.com website, and equivalent international websites. AMAZON claims to have more than two hundred and fifty million active customers, and nearly eighty million monthly subscribers who were allowed to access Prime Music purportedly for free. The service actually cost $10 per subscriber when launched, and as of October 2016 cost $7.99 per month per subscriber, and $9.99 per month to non-subscribers.

14.     Upon information and belief, defendant AMAZON DIGITAL SEVICES, INC is a Delaware corporation with its principal place of business in Seattle, Washington. ADS owns and operates the Amazon Music website. ADS has no independent operation. Instead, it is completely controlled in every manner by defendant AMAZON.

15.     AMAZON and ADS are collectively referred to here as "Defendants".

**JURISDICTION AND VENUE**

16.     The jurisdiction of this Court is based upon 28 U.S.C. §§ 1331 and 1338 in that this controversy arises under the Copyright Act and Copyright Revision Act of 1976 (17 U.S.C § 101 et seq.). This action is a civil action over which this court has original jurisdiction.

17.     On information and belief, a substantial part of the facts of infringement complained of herein occurs or has occurred in this district, and defendant is subject to personal jurisdiction in this district because they maintain a headquarters in this district located at 7 West 34th Street, New York, N.Y.

18.     Personal jurisdiction over Defendants is proper in this Court on the grounds that Defendants, through their interactive web-based subscription service, caused the unlicensed

distribution of the Plaintiffs' and the Putative Class' copyrighted recordings throughout the State of New York, including within this judicial district.

19.     This Court has personal jurisdiction over defendants pursuant to CPLR § 302 (New York's long-arm statute) due to their continuous and systematic business activities within New York as described below.  Defendants have conducted and do conduct business within New York.  Defendants, directly or through intermediaries (including distributors, retailers, and others), ship, distribute, offer for sale, sell, and advertise products in the United States, and specifically to New York.  Defendants purposefully and voluntarily distributed and reproduce Plaintiffs' and the Putative Class' recordings in New York.

20.     Venue in this District is proper under 28 U.S.C. § 1391(b) and (c) and/or 28 U.S.C. § 1400(a).

21.     Plaintiffs have the right to bring the within action pursuant to 17 U.S.C. § 501(b).

22.     The copyright in every musical composition at issue was registered in the United States Copyright Office. 17 U.S.C. §§ 409-412.

23.     Copies of each certificate issued by the U.S. Copyright Office to the named Plaintiffs are annexed and incorporated hereto respectively as **Exhibits 1.**

24.     Each of the Plaintiffs' copyrighted compositions was registered within three months of publication, or thirty days prior to the infringement, and satisfy the registration prerequisite under 17 U.S.C. § 412(c).

## CLASS ALLEGATIONS – PUBLISHING CLASS

25.     Plaintiffs bring this action on behalf of themselves and on behalf of all other similarly situated owners of the publishing a/k/a "mechanical" rights for their registered musical compositions, which were reproduced, made available to the public, and distributed by

Defendants through their interactive streaming and locker products on or after January 1, 2014.

26.     The Publishing Class is comprised of and defined as follows:

> "Plaintiffs and a Putative Publishing Class comprised of artists who are not subject to a blanket license and who own the publishing rights to their recordings, and Defendants elected to exploit the recordings on or after January 1, 2014 (referred to hereafter as the "Putative Publishing Class")."

27.     This action may be properly brought and maintained as a class action because there is a well-defined community of interest in the litigation and the members of the proposed class are clearly and easily ascertainable and identifiable.

28.     The class for whose benefit this action is brought is so numerous that joinder of all class members is impracticable.  Plaintiffs are informed and believe, and on that basis aver, that there are thousands of class members and that those class members can be readily ascertained from defendants' database files and records, and via discovery in this action.

29.     Defendants were statutorily obligated to maintain records of the musical compositions they publish and/or distribute.

30.     The Putative Publishing Class members can be readily located and notified of this action.

31.     The claims of Plaintiffs are typical of the claims of the members of the Putative Publishing Class, and their interests are consistent with and not antagonistic to those of the other Putative Publishing Class members they seek to represent.

32.     Plaintiffs hold the rights to copyrighted musical compositions which Defendants have reproduced and/or distributed on or after January 1, 2014.

33.     Plaintiffs, and all members of the Putative Publishing Class, have sustained actual pecuniary loss and face irreparable harm arising out of defendants' continued infringement as

complained of herein.

34.    Plaintiffs have raised a viable copyright infringement claim of the type reasonably expected to be raised by members of the Putative Publishing Class, and will vigorously pursue those claims.

35.    If necessary, Plaintiffs may seek leave of the Court to amend this Complaint to include additional class representatives to represent the Putative Publishing Class or additional claims as may be appropriate.

36.    Plaintiffs are represented by experienced, qualified and competent counsel who is committed to prosecuting this action.

37.    Common questions of fact and law exist as to all members of the class that predominate over any questions affecting only individual members of the class.

38.    These common legal and factual questions, which do not vary from class member to class member, and which may be determined without reference to the individual circumstances of any class member include, without limitation, the following:

(a)    whether Defendants reproduced, made available, distributed or otherwise exploited Plaintiffs' and the Putative Publishing Class' copyrighted recordings via their Paid Locker, Purchased-Content Locker, Prime Music, or Music Unlimited products and services on or after January 1, 2014;

(b)    whether Defendants' reproduction, making available, and distribution was licensed;

(c)    whether Defendants served valid NOIs for each of the Plaintiffs' and Putative Publishing Class members' recordings prior to distribution;

(d)    whether Defendants had an obligation to serve renewal NOIs every two-years;

(e)    whether Defendants engaged in a practice of materially altering documents to obfuscate the infringements;

(f)    whether Defendants engaged in a practice of materially altering documents;

(g)    whether Defendant AMAZON infringed the rights of all copyright

holders by offering albums for free if the user applies for a credit card;

(h) whether Defendants deleted stream data to hide their infringing activity;

(i) whether Defendants failed to serve any Monthly Statements of Account to conceal the infringements;

(j) whether Defendants failed to serve any Annual Statements of Account to conceal the infringements;

(k) whether Defendants acts of making a recordings available on their services, which are subject to Section 115, was sufficient for liability under the Act, regardless of whether the recording was streamed;

(l) the basis and method for determining and computing damages;

(m) whether Defendants' conduct was intentional as proscribed by 17 U.S.C. § 504(d); and,

(n) whether Defendants' conduct is continuing, thereby entitling Plaintiffs and members of the Putative Publishing Class to injunctive or other relief.

39. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual litigation of the claims of all class members is impracticable.

40. The claims of the individual members of the class may range from smaller sums to larger sums, depending upon the number of infringements. Thus, for those Putative Publishing Class members with smaller claims, the expense and burden of individual litigation may not justify pursuing the claims individually. Even if every member of the class could afford to pursue individual litigation, which is highly unlikely in the independent artist community, the judicial system could not.

41. Individualized litigation would also present the potential for varying, contradictory, or inconsistent judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.

42. On the other hand, the maintenance of this action as a class action presents few

management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each member of the class.

43.     Plaintiffs anticipate no difficulty in the management of this action as a class action.

## CLASS ALLEGATIONS – PUTATIVE PUBLISHING ROYALTY CLASS

44.     Plaintiffs bring this action on behalf of themselves and on behalf of all other similarly situated owners of the rights to copyrighted musical recordings which appeared on Defendants' products which are subject to Section 115 on or after January 1, 2014.

45.     The Putative Publishing Royalty Class is comprised of, and defined, as follows:

> "All owners of mechanical distribution and reproduction rights in musical compositions subject to U.S. Copyright Registrations, which compositions were reproduced, made available, or distributed by Defendants on or after January 1, 2014."

46.     Defendants' systematic failure to pay royalties or late fees, and their unlawful reduction in the all-in royalty pool, payable pool, and per-stream allocation, their deletion of streaming data, and run-time data, as well as their failure to serve Annual and Monthly Statements of Account, deprived Plaintiffs and the Putative Publishing Royalty Class of royalties and late fees.

47.     Plaintiffs and the Putative Publishing Royalty Class seek only to redress the failure to pay publishing royalties and late fees.

48.     This action may be properly brought and maintained as a class action because there is a well-defined community of interest in the litigation and the members of the proposed class are clearly and easily ascertainable and identifiable.

49.     The Putative Publishing Royalty Class for whose benefit this action is brought is so numerous that joinder of all class members is impracticable.  Plaintiffs are informed and

believe that there are tens of thousands of class members and that those class members can be readily ascertained from Defendants' database files and records, and via discovery in this action.

50.     The members of the Putative Publishing Royalty Class are so numerous that joinder of all members is impracticable.

51.     The identities of the Putative Publishing Royalty Class members can be ascertained by mapping.

52.     Plaintiffs and their counsel do not anticipate any difficulties in the management of this action as a class action.

53.     Plaintiffs will fairly and adequately represent the interests of the Putative Publishing Royalty Class and are committed to vigorously prosecute this action and have retained competent counsel experienced in class action litigation.

54.     Plaintiffs are class members and have no interests antagonistic to or in conflict with other Putative Publishing Royalty Class members.

55.     Plaintiffs are represented by attorneys who have extensive experience in prosecuting class actions and will adequately represent the Putative Publishing Royalty Class in this action.

56.     Defendants were statutorily obligated to maintain records of the musical compositions it distributed as well as the paid.  The Putative Publishing Royalty Class members can readily be located from those records and notified of this action.

57.     Plaintiffs and all members of the Putative Publishing Royalty Class have sustained actual pecuniary loss and face irreparable harm arising out of Defendants' systematic and unlawful diminution of the royalty payments with accounting for those payments as described herein.

58.     Plaintiffs have raised a viable claim of the type reasonably expected to be raised by members of the class, and will vigorously pursue those claims.

59.     If necessary, Plaintiffs may seek leave of the Court to amend this Complaint to include additional class representatives to represent the class or additional claims as may be appropriate.

60.     Common questions of fact and law exist as to all members of the class that predominate over any questions affecting only individual members of the class.

61.     These common legal and factual questions, which do not vary from class member to class member, and which may be determined without reference to the individual circumstances of any class member include, without limitation, the following:

(a)     whether, from January 1, 2014 through the trial of this action, Defendants made royalty payments to Plaintiffs and the members of the Putative Publishing Royalty Class for the distribution of their musical compositions;

(b)     whether Defendants failed to make the royalty calculations required in good faith and on the basis of the best knowledge, information and belief of the licensee at the time payment is due, and subject to the additional accounting and certification requirements of 17 U.S.C. 115(c)(5) and § 201.19;

(c)     whether Defendants failed to provide any Monthly Statements of Account.

(d)     whether Defendants failed to provide any Monthly Statements of Account which set forth each step of its calculations with sufficient information to allow the copyright owner to assess the accuracy and manner in which the Defendants determined the payable royalty pool and per-play allocations for each product covered by Section 115;

(e)     whether Defendants failed to provide any Monthly Statements of Account for January 2014 and February 2014 for their Paid Locker Product;

(f)     whether Defendants uploaded to their agents' database fraudulent Annual and Monthly Statements of Account for their Purchased-Content Locker product;

(g)     whether Defendants failed to provide an accurate list of every stream

of Plaintiffs' and the Putative Publishing Royalty Class' musical recording that occurred as well as failed to report free/part streams;

(h)     whether Defendants failed to pay for any royalties and late fees;

(i)     whether Defendants failed to pay for any royalties and late fees from its Paid Locker product;

(j)     whether Defendants failed to pay for any royalties and late fees from its Purchased-Content Locker product;

(k)     whether Defendants failed to serve any Annual Statements of Account;

(l)     whether Defendants' failed to pay royalties and late fees under $50.00;

(m)     whether Defendants owe Plaintiffs and the Putative Publishing Royalty Class late fees;

(n)     the basis and method for determining and computing damages; and,

(o)     whether Defendants' conduct is continuing, thereby entitling Plaintiffs and the members of the Putative Publishing Royalty Class to injunctive or other relief.

62.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual litigation of the claims of all class members is impracticable.

63.     The claims of many of the individual members of the class are likely to be under $50.00; other members' claims will range from small to larger sums.  Thus, for those class members with smaller claims, the expense and burden of individual litigation may not justify pursuing the claims individually.  Even if every member of the class could afford to pursue individual litigation-which is highly unlikely in the artist community-the judicial system could not.

64.     Individualized litigation would also present the potential for varying, contradictory, or inconsistent judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.

65.     On the other hand, the maintenance of this action as a class action presents few

management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each member of the class.

66.     Plaintiffs anticipate no difficulty in the management of this action as a class action.

## **GENERAL FACTS**

67.     As a general proposition, a copyright confers on the owner the exclusive right to reproduce the copyrighted composition.

68.     Absent a license from the copyright owner, which the owner is free to grant or deny, reproduction of the composition by another constitutes copyright infringement.

69.     When Congress enacted the Copyright Act of 1909, it was concerned that exclusivity with respect to musical compositions would give rise to "a great music monopoly." It therefore modified the principle of exclusivity in the case of nondramatic musical Compositions by enacting a compulsory license provision which, in defined circumstances, imposed upon the copyright owner a license permitting the mechanical recording of the copyrighted song "on such media as a phonograph record or a piano roll."

70.     Although recording technology has changed since 1909, licenses to record musical compositions on such media is often called "mechanical licenses."  The within Complaint refers to the "mechanical licenses" as "publishing licenses" or "publishing rights".

71.     The compulsory publishing license concept was carried forward in Section 115 of the Copyright Act of 1976 which, generally speaking, permits an entity wishing to record a copyrighted nondramatic musical Composition to do so in the absence of the copyright owner's consent in exchange for payment of a statutory royalty.

72.     But the availability to Defendants of compulsory publishing licenses is dependent

on the strict limitations of Section 115(b)(1) of the Act which requires, in pertinent part, that

"[a]ny person who wishes to obtain a compulsory license under this section shall, before or

within thirty days after making, and before distributing any phonorecords of the Composition,

serve notice of intention to do so on the copyright owner."

73.     Once Defendant has served a valid and timely NOI, it must provide Monthly and

Annual Statements of Account and pay the statutorily prescribed royalties on a monthly basis.

74.     If Defendants failed to pay royalties by the 20th of the month, Defendants were

required to pay late fees.

75.     The name and address of the owner of the publishing rights is readily ascertained

from the third party aggregator who submitted the recordings to Defendants for review.

76.     If, for some reason, the name and address of the owner of a given composition

cannot be readily identified from the submission records, or the public records of the U.S.

Copyright Office, the Defendants could have filed the NOI with the Copyright Office. See 17

U.S.C. § 115(b)(1).

77.     In that case, Defendants must pay a filing fee to the Copyright Office but does not

need to deposit royalties. See 17 U.S.C. § 115(c)(1); 37 C.F.R. § 201.18(f)(3).

78.     The content and method of service of the NOI are prescribed by statute and

regulation. See 17 U.S.C. § 115(b); 37 CFR 201.18.   Defendants could have included all of the

recordings submitted by each Plaintiff or member of the Putative Publishing Class in a single

NOI.

79.     The duration of the NOI is not proscribed by rule or regulation; consequently, an

industry standard two-year duration is read-into the license.

80.     Defendant ADS's "Digital Rights Agreement" provides that the mechanical

license lasts for a two-year term. See **Exhibit 2**.  This is the same term that all of the NOIs must be limited to.

81.     Defendants intentionally failed to adhere to its Section 115 obligations, while enjoying all of the benefits afforded by Section 115.

82.     With respect to accounting and royalties, Defendants were obligated to make monthly royalty payments to the copyright owner, or authorized agent of the owner, on or before the 21st day of each month for the preceding months sales and streaming records.  Defendants have failed at all times to make monthly royalty payments to Plaintiffs or any Member of the Putative Class.  Defendants have also not paid any statutory late fees.

### Result of Failing to Obtain a Mechanical License

83.     When Defendants make a musical composition available or distribute that composition before a publishing license is obtained, the owner(s) of the publishing rights to that musical composition (generally the artists) does not get paid.  For songwriters, like Plaintiffs, whose recordings are not played on the radio, the royalties earned from streaming revenue is often substantially the largest part of their income.

84.     Moreover, making available and reproducing a musical composition without a license for the publishing rights is copyright infringement under 17 U.S.C. § 501, and may not be cured after the fact by attempting to obtain a compulsory license. See Section 115 ("failure to serve or file an NOI forecloses the possibility of a compulsory license and, in the absence of a negotiated license, renders the making and distribution of phonorecords actionable as acts of infringement . . .".)

85.     The August 4, 1995, United States Senate Report, *Digital Performance Right in Sound Recordings Act of 1995*, confirms:

> Of course, a digital transmission service would be liable for any infringing digital phonorecord delivery it made in the absence of a compulsory license or the authorization of the musical work copyright owner:

Senate Report No. 104- 128, S. Rep. 104-128 (1995) at 27 (emphasis added).

86.   The United States Senate Report further states:

> If a record company grants a license under its rights in the sound recording only, and does not grant a mechanical license under the copyright in the musical work embodied in the sound recording, **it is the transmission service's responsibility to obtain a license under the musical work copyright**.

Senate Report No. 104-128, S. Rep. 104-128 (1995) at 31(emphasis added).

## AGGREGATORS

87.   Aggregators like TuneCore, Distro Kid, or CD Baby, function exactly like a record label for independent artists.

88.   When Defendants' on-line store went live in 2007, aggregators like TuneCore submitted Plaintiffs' and other artists' catalogues for review.

89.   Each of the aggregators make it very clear that it does not convey the publishing rights.

90.   After receipt of the master audition recordings from the aggregator, Defendants may elect to exploit the masters, or reject one or all of the sound recordings.

91.   In March of 2011, when Defendants launched their Purchased-Content and Paid Lockers, they reproduced the entire music library from their Music Store without notice to the rights holders or permission.

92.   In June 2014, when Defendants launched their Prime Music interactive streaming product, they again reproduced the entire music library from their Music Store and Locker products without notice to the rights holders or permission.

93.   When Defendants' Paid and Purchased-Content Locker products fell under

Section 115, Defendants were obligated to serve an NOI covering each musical composition.

## GENERAL FACTS SPECIFIC TO EACH PLAINTIFF

**RICHARD CUPOLO**

94.     CUPLOLO is the beneficial owner of, inter alia, ten (10) U.S. Copyright

Registrations covering ten (10) musical recordings.

95.     Defendants made CUPOLO's ten (10) copyrighted recordings were reproduced

and made available for sale and streaming and distributed every month from January 2014 to

March 2014.

96.     CUPOLO's recordings were streamed on Defendants' Paid Locker product, as

reported by TuneCore, from May 2013 to March 2014.

97.     Defendants failed to serve an NOI for any CUPOLO recording, for any of

Defendants' products.

98.     At no time did Defendants pay CUPOLO any publishing royalties or late fees for

any of Defendants' products.

99.     At no time did Defendants serve an Annual Statement of Account on CUPOLO.

100.    At no time did Defendants serve a Monthly Statement of Account on CUPOLO.

101.    Pursuant to 17 U.S.C. § 501, Defendants infringed CUPOLO's exclusive rights to

all ten (10) of his works.  Defendants acts of infringement were obviously intentional under 17

U.S.C. § 504(c).

**BRIAN EICH**

102.    EICH is the beneficial owner of two (2) U.S. Copyright Registrations.  The

registrations cover two albums, (i) *Sleeping By A Wire* and (ii) *Devil in Disguise*, which have a

combined eighteen (18) recordings.

103.   PRO CD Baby released EICH's eighteen (18) copyrighted recordings to Defendants' Music Store in or about April 2011.

104.   EICH did not choose the digital stores CD Baby released his copyrighted recordings to for review.

105.   In or about April 2011, Defendants reproduced and made available to the public all of EICH's copyrighted recordings in Defendants' Music store.

106.   As of January 2014, all eighteen (18) of EICH's recordings were reproduced and made available to the public and distributed as part of Defendants' Paid Locker and Purchased-Content Locker products.

107.   Defendants were obligated to serve an NOI covering each recording; Defendants did not.

108.   In June 2014, when Defendants launched Prime Music, Defendants reproduced and made available to the public only ten (10) of EICH's eighteen (18) copyrighted recordings.

109.   This means Defendants made a conscious choice to select which of EICH's copyrighted recordings should be included in Prime Music.

110.   In or about October 2016, Defendants reproduced and made available to the public ten (10) of EICH's copyrighted recordings in Defendants' Music Unlimited product.

111.   EICH's ten (10) copyrighted recordings are still available in Defendants' Paid Locker, Purchased-Content Locker, Prime Music, and Music Unlimited products.

112.   EICH never received an NOI for any copyrighted recording for any product.

113.   Defendants never paid EICH any publishing royalties or late fees for any streams for any of Defendants' product.

114.   Defendants never served EICH with an Annual Statement of Account for any of

Defendants' product.

115.    Defendants never served EICH with a Monthly Statement of Account for any of Defendants' product.

116.    Defendants failure to pay royalties or serve an NOI, or serve an Annual or Monthly Statement of Account, is the reason EICH was unaware his copyrighted recordings were available on Defendants products.

117.    Pursuant to 17 U.S.C. § 501, Defendants infringed EICH's exclusive rights to both of EICH's registrations.  Defendants acts of infringement were obviously intentional under 17 U.S.C. 504(c).

## FACTS SPECIFIC TO DEFENDANTS

118.    Defendants owns and operate various music streaming product subject to Section 115, including, the (i) Paid Locker, (ii) Purchased-Content Locker, (iii) Prime Music, and (iv) Music Unlimited products.

119.    In or about March 2011, Defendants launched their Cloud Player product.  The Cloud Player includes the Purchased-Content and Paid Locker products.

120.    When launched, the Purchased-Content and Paid services were not subject to Section 115.

121.    Upon information and belief, in December 2012, Defendants added additional features to their Purchased-Content and Paid Locker products including playlists and song sharing.  These services made the products subject to Section 115, and Defendants were obligated to serve NOIs for every recording in their music library once these new services were launched.

122.    The additional functionality in the Purchased-Content and Paid Locker is based

on "scan and match" technology.  That means, users don't possess their songs, instead, they have a code for each song in an electronic file.  When the user attempts to play the song, the code is sent to ADS, and is matched to the actual song in the possession of Defendants.  The song is then streamed from the Defendants' music library.

123.    On January 1, 2014, Defendants' Paid Locker and Purchased-Content Locker products certainly fell under Section 115 by statute.

124.    At no time have Defendants paid royalties and late fees for their Paid Locker or Purchased-Content Locker products.

125.    The Defendants MP3 Music Store had a substantial library of recordings which Defendants illegally reproduced for use in Defendants' Purchased-Content and Paid Lockers and their "Prime Music" product which was launched in or about June 2014.  When Defendants Music Unlimited product was launched in October 2016, it also reproduced the music library from Defendants' other products.

126.    Prime Music was, at first, a purportedly "free" interactive streaming service was illegally bundled with other non-music products.  The product was originally only available as part of "Amazon Prime", which is a yearly subscription service that combines numerous products and services.

127.    Prime Music was, of course, not free.  Two months before the launch of Prime Music, Defendants increased the yearly price of the Amazon Prime subscription by $20. AMAZON's Prime Music actually cost $10 per year for all 80,000,000 Amazon Prime users. (The other $10 went to the new Amazon Video service).

128.    An examination of **Exhibit 2** confirms Defendants used the Prime Music streaming service to boost Amazon Prime subscriptions and revenues: "It will be included as part

of Amazon Prime as an additional benefit to customers at no additional cost and will be

integrated into the current Amazon music experience."

129.     **Exhibit 2** is the digital agreement ADS forced on smaller publishers on a "take it

or leave it" basis.  It contains a two-year term, which is industry standard.

130.     As of October 2016, Defendants offered their Music Unlimited product.  Music

Unlimited is a premium subscription interactive streaming service that costs:

- Echo Plan: Access to Music Unlimited via Alexa on a single Amazon Echo, Dot, or Tap for $3.99 a month.
- Individual Plan: A Prime member can pay either $7.99 a month or $79 per year to gain access to Amazon Music Unlimited.  Non-prime members pay $9.99 per month.
- Family Plan: $14.99 a month or $149 per year.  Up to six family members will gain access to AMAZON's Music Unlimited on all their devices.

131.     Both Prime Music and Music Unlimited allow users to stream music as well as

create a tethered download library of temporary digital downloads.

132.     The only difference between Defendants Prime Music and Music Unlimited

products is that Prime Music is included with the Prime membership at no additional cost and

allegedly features over two million songs and more than a thousand playlists and stations.

133.     With Music Unlimited, the user gets all of the features and functionality of Prime

Music, but with a purported music library of tens of millions of songs and thousands of playlists

and stations.

134.     Defendants' Music Unlimited is broken into two services, the first is a stand-alone

portable subscription service, and the second is a stand-alone non-portable streaming only

service to its Alexa product.

135.     Defendants have, to date, not paid any royalties or late fees to Plaintiffs or any

member of the Putative Publishing Royalty Class for its stand-alone portable subscription

service.

136.     Defendants have, to date, not paid any royalties and late fees to Plaintiffs or any member of the Putative Publishing Royalty Class for its stand-alone non-portable streaming only service to its Alexa product.

137.     Defendants failed to serve an NOI for the vast majority of the independent artists' recordings (which make up approximately 20% of their music library).

138.     Defendants' hired a company called Music Reports, which is a Professional Rights Organization ("PRO"), to act as the administrator of Defendants' licenses and distribute Defendants' publishing royalties and late fees.

139.     Defendants' agent Music Reports admitted at least half of the independent artists' recordings on its system are unlicensed.  Specifically, the Music Reports CEO filed a sworn statement with the Copyright Royalty Board stating:

> Regarding the licensing coverage of the Section 115 license:  it is true, as critics have pointed out, **that it is not possible to license all of the tens of millions of musical works in the typical digital music service catalog using the Section 115 statutory license**. . . . Through internal testing, Music Reports has determined that it can license well over 90% of the typical digital music service sound recording usage (as opposed to sound recording catalog, including dormant catalog).

See **Exhibit 3.**

140.     Music Reports admitted it cannot license all of the recordings, and at least 10% of the recordings on its system are unlicensed.  When one factors in 70% of the recordings are subject to a blanket license with the major record companies, and 10% are subject to licenses with the smaller labels, that leaves the independent artists' recordings which comprise 20% of their library.  In reality, "10% unlicensed recordings" means 50% of the independent artists' recordings, like Plaintiffs and the Putative Publishing Class, are unlicensed – by admission.

141.    In an interview on *It's So Krucial* on Sound Cloud, William Colitre, Vice President at Music Reports, stated -- streaming companies receive 500,000-750,000 recordings per month.  See <https://soundcloud.com/itssokrucial/episode-06-bill-colitre>.

142.    This volume is far too much for Defendants to license.  Colitre states -- artists and composers have to match their recordings to what is being streamed.  "Music Reports only has 40 people" and only the artists can match all the unlicensed recordings being streamed. See <https://soundcloud.com/itssokrucial/episode-06-bill-colitre>.

143.    Music Reports created a "Claiming System" to handle the problem of unlicensed streaming.  However, any artist signing up for the "Claiming System", also agrees to the following:

> 1) You agree to receive Notices of Intention to Obtain a Compulsory License pursuant to Section 115 ("NOIs") from us electronically, which will be posted to your web account with us in both a page view and a downloadable spreadsheet format. We will no longer send you NOIs by mail unless you later withdraw your consent to electronic NOIs by emailing RoyaltyServices@Music Reports.com. Such withdrawal will be effective within 30 days of the request.
>
> 2) Notwithstanding anything to the contrary, you agree that any such NOIs will be deemed valid and effective from the date of first distribution of the musical works identified in any such NOIs, even if that date is in the past.

144.    The "Claiming System" has been described as "an out-of-court settlement to deflate the class action."

145.    Music Reports, however, cannot legally enter into legally viable retroactive licenses under these circumstances.  If Defendants streamed a recording without a license, it cannot be cured with a retroactive license.

## THE INFRINGEMENTS

146.    Tune Core, LLC CUPOLO's recordings to Defendants' on-line Music Store.

147.     Plaintiff EICH's recordings were submitted for review by CD Baby.

148.     Defendants had the right to accept the recordings or reject the recordings.

149.     If the Defendants elected to accept the recordings, they were obligated to serve an NOI on each owner for each musical composition included prior to distribution.

150.     Defendants' obligation to serve an NOI attached when they added additional features to their Purchased-Content and Paid Locker products.

151.     Defendants' Paid Locker product was brought under Section 115 on January 1, 2014 by statute.

152.     When Defendants launched their products: (i) Prime Music in June 2014, and (ii) Music Unlimited in October 2016, each was subject to Section 115 on day one.

153.     Defendants never served an NOI on EICH or CUPOLO.  As a result, Defendants infringed all of EICH's and CUPLOLO's copyrighted recordings.

154.     Defendants did not serve an NOI on any Plaintiff for their Prime Music or Music Unlimited products.  As a result, Defendants infringed all of the Plaintiffs' copyrighted recordings.

### THE ROYALTIES AND PURPORTED NOIs

**PLAINTIFFS EICH AND CUPOLO**

155.     EICH is the beneficial rights holder to two U.S. Copyright Registrations, Nos. SRu 925-601, and SRu 661-491.

156.     EICH's copyrighted recordings have been made available to the public by Defendants since at least January 1, 2014.

157.     EICH never received a NOI, royalty, late fee, Annual Statement of Account, or Monthly Statement of Account, and his exclusive rights under the Act have unquestionably been

infringed.

158.    CUPOLO is the beneficial rights holder to ten (10) U.S. Copyright Registrations covering ten (10) recordings.

159.    CUPOLO's copyrighted recordings were made available to the public, by Defendants, from May 1, 2013 to March 31, 2014.

160.    CUPOLO never received a NOI, royalty, late fee, Annual Statement of Account, or Monthly Statement of Account, and his exclusive rights under the Act have unquestionably been infringed.

## DEFENDANTS HAVE NOT PAID ROYALTIES

161.    Defendants were obligated to serve monthly royalty payments pursuant to 17 U.S.C. § 115(c)(5).

162.    The statute states that "the royalty under a compulsory license shall be payable for every phonorecord made and distributed in accordance with this license," and that a phonorecord is "distributed" when the licensee "has voluntarily and permanently parted with its possession." 17 U.S.C. 115(c)(2).

163.    In addition, the statute specifies that "[r]oyalty payments shall be made on or before the twentieth day of every month and shall include all royalties for the month next preceding." Id. at 115(c)(5).  17 U.S.C. 115(c)(5) further provides: "[e]ach monthly payment shall be made under oath and shall comply with requirements that the Register of Copyrights shall prescribe by regulation". See also 79 F.R. 181, pg. 56199.

164.    Defendants admitted: "royalties under the Section 115 statutory licenses are required on a monthly basis." March 2014, DiMA Statement to the CRB.

165.    At no time has any named Plaintiff received a monthly royalty payment.

166.    Upon information and belief, there are tens of thousands of members of the Putative Publishing Royalty Class never received a monthly payment

167.    Defendant never made any payment under oath as required by 17 U.S.C. 115(c)(5).

### DEFENDANTS' BOGUS $50.00 MINIMUM ROYALTY THRESHHOLD

168.    Defendants falsely claim they have no obligation to pay any streaming royalties until they accrue to $50.00.

169.    Defendants admitted:

> [D]igital music service providers must often make assumptions about how much to accrue, and then hold the accrued amounts for substantial periods of time. See **Exhibit 2** pg. 21.

170.    Defendants blatantly ignore the fact that "the royalty under a compulsory license shall be payable for every phonorecord made and distributed in accordance with this license," and that a phonorecord is "distributed" when the licensee "has voluntarily and permanently parted with its possession." 17 U.S.C. § 115(c)(2).

171.    In addition, the statute specifies that "[r]oyalty payments shall be made on or before the twentieth day of every month and shall include all royalties for the month next preceding." Id. at § 115(c)(5).

172.    The $50.00 minimum threshold was considered, and rejected the Copyright Royalty Board, finding; "[a]fter carefully considering the issue, the Office concludes that it has only very limited authority to establish a minimum payment threshold.  Although, as the Joint Commenters note, the statute gives the Office discretion in setting forth the scope and form of any monthly payments made under the statute, the statute also cabins the Office's ability to alter the basic schedule of royalty payments." 79 F.R. 181, pg. 56198.

173.    The CRB further stated:

> "[a]ccordingly, the final rule provides for a mandatory minimum payment threshold of one cent and permits a compulsory licensee to defer delivery of monthly statements of account and any associated royalty payments until the cumulative unpaid royalties that it owes a copyright owner equal at least one cent." Id.

174.    There is, of course, no minimum payment threshold.  Moreover, once an artists' work has been removed from Defendants' service, as Plaintiffs CUPOLO's recordings have been removed here, all royalties must be paid.

175.    Defendants failed to make any payments for streams after they removed Plaintiffs' recordings.

176.    Defendants routinely permanently delete the recordings of independent artists. Those artists will never be paid by Defendants, because their royalties will never reach the bogus $50 minimum threshold of Defendants.

177.    Defendants have no excuse for not compensating artists, like the named Plaintiffs, and the Putative Class members whose recordings have been permanently deleted.

178.    Other independent artist own recordings which are active on Defendants' system, but will never likely reach the bogus $50.00 minimum threshold because Defendants compensate streams at a drastically, and illegal, low per-stream rate, as well as the fact that Defendants illegally delete stream data.

179.    Plaintiffs and member of the Putative Publishing Royalty class are owed their royalties.

## DEFENDANTS HAVE NEVER PAID LATE FEES

180.    A Licensee shall pay a late fee of 1.5% per month, or the highest lawful rate, whichever is lower, for any payment received by the Copyright Owner after the due date set

forth in § 201.19(e)(7)(i) of this title. Late fees shall accrue from the due date until payment is received by the Copyright Owner. See 37 C.F.R. § 385.4.

181.     Defendants have never paid late fees to Plaintiffs or any member of the Putative Publishing Royalty class pursuant to 37 C.F.R.§ 385.4.

182.     Defendants retain royalties with no late fee payments.

183.     The named Plaintiffs and all members of the Putative Publishing Royalty class are owed late fees on their royalties.

## DEFENDANTS HAVE NEVER PAID ROYALTIES OR LATE FEES
## FOR THEIR PAID LOCKER PRODUCT

184.     At no time have Defendants compensated Plaintiffs or the members of the Putative Publishing Royalty class they compensate for streams related to their Paid Locker product.

185.     The Plaintiffs and members of the Putative Publishing Cass will never be compensated for streams related Defendants Paid locker product unless addressed by the Court here.

186.     Defendants also never uploaded (albeit illegally) Monthly Statements of Account for January 2014 or February 2014 for any Plaintiff or Putative Publishing Class Member.

## DEFENDANTS HAVE NEVER PAID ROYALTIES OR LATE FEES
## FOR THEIR PURCHASED CONTENT LOCKER PRODUCT

187.     At no time have Defendants compensated Plaintiffs or the members of the Putative Publishing Royalty class they compensate for streams related to their Purchased Content Locker product.

188.     Defendants uploaded unserved Monthly Statements of Account for their Purchased Content Locker product.

189.    The Plaintiffs and members of the Putative Publishing Cass will never be compensated for streams related Defendants Paid locker product unless addressed by the Court here.

### DEFENDANTS PRIMARY PURPOSE IS NOT TO DISTRIBUTE MUSIC

190.    Section 115(a)(1) of the Act was enacted to protect against the very situation here – a company that has nothing to do with providing phonorecords bundling a streaming service with unrelated services and claiming the benefits of a bundled service.  Moreover, where, as here, the reproduction and distribution was for the primary purpose of attracting subscribers to its non-music products.

191.    Section 115 (a)(1) titled "Availability and Scope of Compulsory License" states, in pertinent part: ". . . A person may obtain a compulsory license only if his or her primary purpose in making phonorecords is to distribute them to the public for private use, including by means of a digital phonorecord delivery."

192.    Defendants Amazon Prime product has nothing to do with distributing phonorecords and, again, its primary purpose was to support its non-music subscription.

193.    What Defendants have done is bundled a music product with wholly unrelated products.  Amazon describes itself as "The largest Internet-based retailer in the world by total sales and market capitalization."

194.    A comprehensive list of all the Amazon goods and services show music distribution is an insignificant part of the Defendants' business: Amazon Prime, Consumer electronics, Digital content, Amazon Games, Amazon Art, Amazon Video, Amazon Drive, Private labels and exclusive marketing arrangement, Amazon Studios, Amazon Web Services, New book content production, Amazon Local, Amazon Wireless, Amazon Fresh, Amazon Prime

Pantry, Amazon Dash, Amazon Prime Air, Prime Now, Amazon Go, Amazon Supply, Video

Direct, Amazon Tickets, and STEM Club.

195.    Defendants are not in the business of distributing phonorecords, and their primary

purpose was not to distribute phonorecrds.  This fact is borne out by their Digital Rights

Management Agreement.  The ADS Digital Rights Agreement demonstrates that the intent of the

"free" service was to bolster the Amazon Prime subscription rate. See **Exhibit 2**.

196.    Defendants should not be allowed the benefit of being considered a bundled

service,

## DEFENDANTS HAVE ENGAGED IN A PATTERN OF DATA MANIPULATION AND ALTERED DEFENDANTS' RECORDS TO JUSTIFY DEFENDANTS THEFT OF ROYALTIES

### 1 – Defendants Mis-Reported the Number of Streams in Order to Decrease the Royalties They Actually Paid.

197.    Defendants go to amazing lengths to avoid paying royalties or late fees.

198.    Defendants did not report stream data to cover the infringements.

### 2 - Defendants never uploaded Monthly Statements of Account for January 2014 or February 2014 for its Paid Locker product.

199.    While Defendants Paid Locker product fell under Section 115 as early as

December 1, 2012, it absolutely fell under Section 115 as a matter of law on January 1, 2014.

200.    Defendants participated in the Copyright Royalty Board hearings on "Adjustment

of Determination of Compulsory License Rates for Mechanical and Digital Phonorecords."

201.    The 2013 regulation provides: "(b) Legal compliance. A licensee that, pursuant to

17 U.S.C. 115, makes or authorizes reproduction or distribution of musical works in limited

offerings, mixed service bundles, music bundles, paid locker services or purchased content

locker services shall comply with the requirements of that section, the rates and terms of this

subpart, and any other applicable regulations, with respect to such musical works and uses licensed pursuant to 17 U.S.C. 115."

202.   Rishi Mirchandani, the Head of Content Acquisition and Catalog for Amazon's digital music business

> "explains that the current scheme was born by carefully negotiated agreement among the interested parties, and accordingly, that existing service categories and rate structures already roughly reflect the relative roles of rights holders and DSPs with respect to creative contribution, technological contribution." See **Exhibit 5**.

203.   The new regulation states on page 1 "DATES: Effective: January 1, 2014."

204.   For Plaintiffs CUPOLO, and EICH, Defendants never served Monthly Statement of Account nor did Defendants upload Monthly Statements of Accounts to their agent Music Reports' database.

205.   Plaintiffs and members of the Putative Publishing Royalty class have been damaged by Defendants failure to serve Monthly Statements of Account, as well as not being able to calculate their royalties for January 2014 and February 2014 for Defendants' Paid Locker product from unserved, illegally uploaded Monthly Statements of Account.

**3 - Defendants overinflated the number of streams to decrease the royalties they actually paid.**

206.   Defendants admitted:

> "In addition, according to Nielsen's 2016 Nielsen Music Mid-Year U.S. Report, total streams are up 97.4%, from 57.5 in the first half of 2015 to 113.6 billion in the first half of 2016.  Total U.S. digital music consumption is also up nearly 15%, from 194.6 million units in the first half of 2015 to 223.5 million units in the first half of 2016."  See **Exhibit 6.**

207.   Defendants admitted streams in 2015 for the entire industry were 57.5 billion for the first half of the year.

208.    In 2014, Nielson reported: "On-Demand Streaming Up 54%, with 164 Billion Streams in 2014."

209.    It also equals 3,629 streams per user.  At 4 minutes per song, that equals 14,516 minutes per subscriber for March 2014.  That equals 241 hours per subscriber for the month, which means every subscriber purportedly streamed music on Defendants' Paid Locker product 24 hours a day for 10 days.

210.    Miraculously, after Defendants statutory obligation to pay royalties kicked in, the streams used to calculate the per-stream royalty rate went from 131,331,660 in December 2013 to 531,112,955 in March 2014.  See **Exhibit 7**.  More total streams means, of course, a lower per-stream rate.

211.    The streams went from 131,331,660 in December 2013 to 531,112,955 in March 2014, yet the number of subscribers remained almost the exact same.

212.    Obviously, the number of streams could not have gone from 131,331,660 to 531,112,955 in the span of three months.  The number of streams in both December 2013 AND March 2014 are a farce.

213.    Nielson reported 118.1 billion streams for the entire industry for the entire year in 2013. See **Exhibit 8**.

214.    Defendants claim 6.37 billion stream in 2014 would make the smallest streaming company one of the largest.

215.    Spotify, the industry leader, by far, reported that in 2014, the average Spotify user listened for 3,410 minutes per month.  That means Defendants claim their Paid Locker service average subscriber listened for 11,106 more minutes per month in March 2014 than the average Spotify user. See **Exhibit 9.**

216. Being that Defendants never paid royalties on its Paid Locker product, multiplying the March 2014 number of streams - 531,112,955 - by the per stream royalty rate of $0.0000687, Defendants owe $36,487 in royalties and even more in late fees. That calculation is, of course, under Defendants' artificially deflated numbers. The actual unpaid royalties and late fees for Defendants' Paid Locker product for March 2014, and every other month, is substantially higher.

217. There is no justification for the Paid Locker per stream rate, it is a complete farce.

**Prime Music**

218. The same faulty stream calculation was used for Prime Music.

219. In July 2014, Defendants claim their Prime Music product had 1,267,569 users and 121,303,132 monthly streams. See **Exhibit 10**.

220. 121,303,132 streams equals 14,55,637,584 streams for the year. The Neilson Co. reported the aggregate on-demand streams from AOL, Beats, Cricket, Google Play, Medianet, RDIO, Rhapsody, Slacker, Spotify, XBOM Music, YouTube and Vevo was, 163,900,000. See **Exhibit 11**.

221. That would make Prime Music by far the leader in the streaming industry in only its second month. Defendants didn't upload a streaming report for the first month of Prime Music.

222. All of this is a sham, engineered to lower the per-stream rate in order to steal royalties from artists. Defendants numbers are so bizarre, their intent is obvious.

**4 – Defendants Paid Locker per-stream rate is a farce**

**Paid Locker Reports**

| Mo. | Year | Product | Per Stream Rate |
|---|---|---|---|
| Nov. | 2012 | Paid Locker | $0.000204 |
| Dec. | 2012 | Paid Locker | $0.000171 |
| Jan. | 2013 | Paid Locker | $0.000140 |
| Feb. | 2013 | Paid Locker | $0.000228 |
| Mar. | 2013 | Paid Locker | $0.000257 |
| Apr. | 2013 | Paid Locker | $0.000302 |
| May | 2013 | Paid Locker | $0.000302 |
| June | 2013 | Paid Locker | $0.000326 |
| July | 2013 | Paid Locker | $0.000342 |
| Aug. | 2013 | Paid Locker | $0.000341 |
| Sept. | 2013 | Paid Locker | $0.000363 |
| Oct. | 2013 | Paid Locker | $0.000377 |
| Nov. | 2013 | Paid Locker | $0.000327 |
| Dec. | 2013 | Paid Locker | $0.000273 |
| Jan. | 2014 | Paid Locker | NO REPORT |
| Feb. | 2014 | Paid Locker | NO REPORT |
| Mar. | 2014 | Paid Locker | $0.0000687 |
| Apr. | 2014 | Paid Locker | $0.0000762 |
| May | 2014 | Paid Locker | $0.0000769 |

| June | 2014 | Paid Locker | $0.0000762 |
|------|------|-------------|-----------|
| July | 2014 | Paid Locker | $0.0000819 |
| Aug. | 2014 | Paid Locker | $0.0000801 |
| Sept. | 2014 | Paid Locker | $0.0000857 |
| Oct. | 2014 | Paid Locker | $0.0000858 |
| Nov. | 2014 | Paid Locker | $0.0000710 |
| Dec. | 2014 | Paid Locker | $0.0000578 |

223.    It is obvious from the above-chart Defendants manipulated the per-stream rate once its statutory obligation undoubtedly attached.  In December 2013, the Paid Locker royalty rate was $0.000273.  In March 2014 it was one tenth of the December rate, or $0.0000687.

224.    The rate decrease from December 2013 to March 2014 was due to the increase in the number of streams used to calculate the per-stream rate.  While the subscribers remained the same, the number of songs streamed increased from

225.    Plaintiffs and the members of the Putative Publishing Royalty Class have been damaged by this manipulation which impacts both royalties and late fees.

**5 – Defendants never paid royalties to the named Plaintiff or Putative Class member for their Purchased Content Locker service.**

226.    At no time have Defendants paid royalties for its purchased content locker service.

227.    For Purchased Content Lockers, the royalties are computed by taking the all-in royalty and subtracting the performance royalties and dividing by the total streams.

228.    Defendants elected to use the rate of $0.0000500 in each month for Plaintiffs and the Putative Publishing Royalty Class.

229.    Of course, even after calculating the revenues, Defendants never paid revenues for any royalties owed for its Purchased Content Locker product.

**3 - Defendants have not paid royalties or issued Monthly Statements of Account for their Music Unlimited product.**

230.    Music Unlimited is a stand-alone subscription portable music service launched in October 2016.

231.    No named plaintiff has received a royalty or been served with a Monthly Statement of account for Music Unlimited.

232.    Plaintiffs and the members of the Putative Publishing Royalty Class have been injured by the above behavior.

## DEFENDANTS STOLE MONEY FROM PLAINTIFFS AND THE CLASS

233.    Defendants failure to pay for any royalties or late fees related to its Cloud Player, Prime Music and Music Unlimited products is theft.

234.    Plaintiffs CUPOLO and EICH were not paid royalties or late fees for any product.

235.    Defendants have never compensated plaintiffs CUPOLO or EICH for any streaming activity related to their recordings.

236.    The theft of royalty revenue is not unique to Plaintiffs, but impacts every member of the Putative Publishing Royalty Class.

## DEFENDANTS FAILED TO SERVE MONTHLY STATEMENTS OF ACCOUNT

237.    Defendants were obligated to serve a "Monthly Statement of Account", every month following a month in which any recording is streamed. See 17 U.S.C. § 115(c)(5). Defendants failed in every month relevant to this Complaint to serve a Monthly Statement of Account on each of the Plaintiffs.

238.    On information and belief, Defendants have not served a Monthly Statement of

Account on any Putative Plaintiff in any month covered by this Complaint.

239. The service of the Monthly Statement of Account on a copyright owner may be accomplished by means of service on either the copyright owner or an agent of the copyright owner with authority to receive Statements of Account on behalf of the copyright owner. See 37 CFR § 201.19(a)(4).

240. Plaintiffs CUPOLO, and EICH never had access to the database found at www.Music Reports for their individual recordings.

241. By regulation, "[e]ach Monthly Statement of Account shall be served on the copyright owner or the agent with authority to receive Monthly Statements of Account on behalf of the copyright owner to whom or which it is directed, together with the total royalty for the month covered by the Monthly Statement, by mail or by reputable courier service on or before the 20th day of the immediately succeeding month." 37 C.F.R. 210.19(e).

242. Defendants failed to serve monthly statements, and clearly failed to timely upload the unserved statements.

**CUPOLO, and EICH Royalty Underpayment**

243. Plaintiffs CUPOLO, and EICH were never paid royalties or late fees from any of Defendants' products.

244. Specifically, EICH, and CUPOLO were not compensated for any streams from Defendants' Prime Music, Unlimited Music, Limited Locker, or Paid Locker products.

245. Defendants removed all of CUPOLO's recordings from their music libraries, without paying a single penny toward the royalties or late fees they owe.

246. This means CUPOLO's can never reach the magical (and illegal) $50.00 minimum threshold for a royalty payment.  CUPOLO will never be paid for the royalties they

earned or late fees.

247.     There are thousands, possibly tens of thousands, of Putative Publishing Royalty

Class members who have been paid nothing by Defendants, and never will.

**FIRST CLAIM FOR RELIEF**
**COPYRIGHT INFRINGEMENT**
**(On Behalf of Plaintiffs and the**
**Putative Publishing Class Against all Defendants)**

248.     Plaintiffs and the Putative Publishing Class incorporate the allegations contained

in the preceding paragraphs as if set forth at length here.

249.     Defendants have, without a license for the publishing rights from Plaintiffs or the

Putative Publishing Class, reproduced, made available to the public, and distributed Plaintiffs'

copyrighted compositions through its interactive web-based subscription streaming products

Cloud Player, Prime Music, and/or its Music Unlimited.

250.     It cannot be disputed that the Plaintiffs and the Putative Publishing Class have

valid, registered copyrights and own the publishing rights to their copyrighted compositions.

Defendants reproduced and offered the copyrighted compositions for streaming, including

permanent and temporary digital download, without a license for the publishing rights, thus

infringing Plaintiffs' and the Putative Publishing Class' rights under Section 115 of the

Copyright Act. Irreparable injury is presumed here as Plaintiffs and the Putative Publishing Class

have established a prima facie case of copyright infringement.

251.     Even after Defendants were put on notice in a previous action in this Court just

three years ago, defendant elected to continue to reproduce and publicly perform and/or publicly

distribute copyrighted compositions through its locker service.

252.     The making or the distribution, or both, of all copyrighted compositions without

the payment of proper royalties and late fees is actionable as acts of infringement under section 501 and fully subject to the remedies provided by sections 502 through 506 and 509.

253.     Each time Plaintiffs and Putative Publishing Class were deprived of their statutory royalty entitlement, e.g., by non-payment of royalties and late fees, a distinct harm was done to Plaintiffs' and the Putative Publishing Class' property interest.

254.     Defendants' predatory conduct was clearly intentional within the meaning of 504(c)(2) for purposes of enhancing statutory damages.  Defendants knew that their actions constituted an infringement each time it failed to serve an NOI or make a royalty payment.

255.     Defendants' knowledge may also be inferred from its conduct including the reckless disregard of the Plaintiffs' and Putative Class' rights (rather than actual knowledge of infringement), which suffices to warrant award of the enhanced damages.

256.     As a direct and proximate result of each of the Defendants' infringement, Plaintiffs and the Putative Publishing Class have incurred damages, as described more fully above. Pursuant to 37 C.F.R. § 385, Plaintiffs and the Putative Publishing Class are entitled to a "per stream" statutory royalty rate of $.01 for interactive web-based streaming services like Defendants.

257.     Plaintiffs and the Putative Publishing Class may also elect to recover statutory damages pursuant to 17 U.S.C. § 504(c)(2) for willful infringement of up to $150,000, but not less than $30,000, for each registration which has been infringed.

## SECOND CLAIM FOR RELIEF
## COPYRIGHT INFRINGEMENT
### (On Behalf of Plaintiffs and the Putative
### Publishing Class Against AMAZON)

258.     Plaintiffs and the Putative Publishing Class incorporate the allegations contained in the preceding paragraphs as if set forth at length here.

259.     Defendant AMAZON has, without a "mechanical" license under Section 115 from Plaintiffs or he Putative Publishing Class, reproduced and publicly performed and/or publicly distributed Plaintiffs and the Putative Publishing Class' copyrighted compositions through its website Amazon.com.

260.     Defendant AMAZON's policy of offering copyrighted recordings for free if the user starts an Amazon charge account is an act of infringement.

261.     Plaintiffs and the Putative Publishing Class may also elect to recover statutory damages pursuant to 17 U.S.C. § 504(c)(2) for willful infringement of up to $150,000, but not less than $30,000, for each infringement of each copyright registration as available under the law.

**THIRD CLAIM FOR RELIEF**
**CONTRIBUTORY AND VICAROUS INFRINGEMENT**
**(On Behalf of Plaintiffs and the Putative**
**Publishing Class Against AMAZON)**

262.     Plaintiffs and the Putative Publishing Class reallege and incorporate by reference each and every allegation contained in the preceding paragraphs with the same force and effect as if fully set for that length herein.

263.     Defendant AMAZON had knowledge of the infringing activity, and induced, caused or materially contributed to the infringing conduct of defendant ADS.

264.     Defendant AMAZON has the right and ability to supervise the infringing activity and also has a direct financial interest in the activity.

265.     Plaintiffs and the Putative Publishing Class members have been damaged, and Defendants have been unjustly enriched, in an amount that is not as yet fully ascertained but which Plaintiffs are informed and believe is not less than $150,000 according to proof at trial.

## FOURTH CLAIM FOR RELIEF
## FAILURE TO PAY ROYALTIES
### (On Behalf of Plaintiffs and the Putative
### Publishing Royalty Class Against All Defendants)

266.    Plaintiffs and the Putative Publishing Royalty Class reallege and incorporate by reference each and every allegation contained in the preceding paragraphs with the same force and effect as if fully set for that length herein.

267.    As described herein, Defendants systematically shorted the publishing royalties and late fees owed to Plaintiffs and the Putative Publishing Royalty Class.

268.    Plaintiffs and the Putative Publishing Royalty Class members have been damaged, and Defendants have been unjustly enriched, in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and on behalf of all other persons similarly situated, respectfully prays for relief against Defendants as follows:

1.    Certify this matter as a class action;

2.    Enter an order appointing Plaintiffs as class representative and Plaintiffs' counsel as class counsel;

3.    Enter judgment in favor of Plaintiffs and each class;

4.    Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiffs and the Class (17 U.S.C. § 502), including enjoining defendant from continued copyright infringement and violations of the relevant provisions of the Copyright Act;

5.    A temporary, preliminary, and permanent injunction enjoining and restraining AMAZON and ADS, and their respective agents, servants, directors, officers, principals, employees, representatives, subsidiaries and affiliates, companies, successors, assigns, and those acting in concert with them or at their direction, from further violations;

6.    Injunctive relief that requires AMAZON and ADS to pay for the services of a third party auditor to identify the owners of all works reproduced and/or distributed by Defendants despite Defendants' failure to first obtain a mechanical license prior to reproducing and/or distributing the Works, and further requiring

defendant ADS to remove all such unlicensed tracks from its services until it obtains proper licenses for them;

7.  Restitution of Defendants' unlawful proceeds, including Defendants' gross profits;

8.  Award compensatory damages to Plaintiffs and the Putative Class in an amount to be ascertained at trial;

9.  Award statutory damages to Plaintiffs and the Putative Class according to proof, including but not limited to all penalties authorized by the Copyright Act (17 U.S.C. §§ 504(c)(1), 504(c)(2));

10.  Award reasonable attorneys' fees and costs (17 U.S.C. § 505);

11.  Award Plaintiffs and each Putative Class member pre- and post-judgment interest to the extent allowable; and,

12.  Award Plaintiffs and the Putative Publishing Royalty Class all unpaid royalties and late fees.

13.  Award such other and further relief that the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: April 8, 2017                                   GARBARINI  FITZGERALD P.C.

By: _____

Richard M. Garbarini (RG 5496) 250 Park Avenue, 7th Floor
New York, New York 10177
Telephone: (212) 300-5358
Facsimile: (347) 218-9479